## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANKLIN A. RICHARDS     *
529 Florida Avenue     *
Apt. 202     *
Herndon, VA  21070-4922     *
    *
        Plaintiff     *
    *
   v.     *
    *
CENTRAL INTELLIGENCE AGENCY     *
Washington, D.C. 20505     *
    *
     and     *
    *
GENERAL MICHAEL V. HAYDEN     *     Civil Action No.: _____
Director, Central Intelligence Agency     *
Washington, D.C. 20505     *
    *
     and     *
    *
CIA DOES #1 - #20     *
(Employees of the Central Intelligence     *
Agency, whose exact identity is unknown     *
to Plaintiff at this time and/or is classified)     *
    *
        Defendants.     *
*    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT

Plaintiff Franklin A. Richards brings this action against defendants Central Intelligence Agency ("CIA"), General Michael V. Hayden, Director, Central Intelligence Agency ("DCI"), and CIA Does 1-20, jointly and severally, pursuant to the Constitution of the United States (including, but not limited to, the Fifth Amendment to the Constitution), the Privacy Act, 5 U.S.C. § 552a *et seq.*, the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 2674 and 2680(h), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the All Writs Act, 28 U.S.C. § 1651, and the Central Intelligence Agency's internal regulations and procedures.

### JURISDICTION

1.      This Court has jurisdiction over this action pursuant to, *inter alia*, 5 U.S.C. §§ 552a (g)(1), 702 and 28 U.S.C. §§ 1331, 1346 (b), 2675.

### VENUE

2.      Venue is appropriate in this District under, *inter alia*, 5 U.S.C. §§ 552a (g)(5), 703 and 28 U.S.C. § 1391.

### PARTIES

3.      Plaintiff Franklin A. Richards ("Richards") was employed by the CIA from 1990-2006.    At the time of his involuntary retirement, Richards was the Deputy Chief of **[REDACTED BY CIA]**[1] for the Special Activities Division.    During his tenure at the CIA, Richards received numerous commendations and awards.

4.      Defendant Central Intelligence Agency is an agency of the United States Government as defined by 5 U.S.C. §§ 552(a)(1), 701.

5.      Defendant General Michael V. Hayden became the Director of Central Intelligence ("DCI") on May 30, 2006.   Porter J. Goss was his immediate predecessor having served from September 24, 2004 to May 26, 2006.   George Tenet was Goss's immediate predecessor having served from July 1997 to July 2004.  Upon information and belief, the DCI in office at the relevant times (as well as other known and unknown senior CIA leadership who report to the DCI, including, but not limited to, K.D. "Dusty" Foggo, who was the Executive Director of the CIA ("EXDIR") during the relevant time period) has likely been personally

---

[1] CIA has reviewed a draft of this complaint prior to its filing and has made certain redactions. Plaintiff submits the complaint with CIA's redactions, but reserves the right to challenge any such redactions and/or classification of information at a later date.  Plaintiff also reserves the right to challenge the exclusion of any information he has voluntarily withheld at CIA's request.

briefed and involved, in his professional capacity, in matters pertaining to Richards. The DCI maintains an office within the District of Columbia and, upon information and belief, events pertaining to Richards took place within this jurisdiction.

6.      CIA Does #1 - #20 inclusive were at all times described herein, employees of the CIA and were responsible for the actions described *infra*. At all times described herein, CIA Does #1- #20 inclusive acted both inside and outside the scope of their employment and acted as agents of each other. At this time Richards is either unaware of the identities of CIA Does #1-#20 and/or the individuals' identities may be classified.

## FACTUAL BACKGROUND

7.      Richards re-alleges and incorporates by reference all the allegations contained in paragraphs 1-6, *supra*.

8.      Franklin Richards began working for Printing and Photography Group ("P&PG") at the CIA in 1990.

9.      After a series of promotions, awards, and commendations, Richards held the position of Deputy Chief of **[REDACTED BY CIA]** Special Activities Division in the Directorate of Operations. He held this position until his forced medical retirement by CIA in May of 2006.

10.      In or about the summer of 2003, Richards was instructed by his superiors at CIA[2] to facilitate the weapons training of certain individuals (both CIA employees and non-CIA civilians) in a foreign country[3]. This was required because the "team" that required training was inserted into this country without the proper training, thus requiring the immediate need for such

---

[2] The identities of these individuals is known to Plaintiff but have been withheld from this document pursuant to the CIA's request.
[3] The identity of this foreign country is known to Plaintiff but has been withheld from this document pursuant to the CIA's request.

3

training "on-site". The CIA had very strict guidelines in place requiring all officers going "in country" to be weapons certified [**REDACTED BY CIA**] – without exception.

11.    In a briefing at CIA headquarters in Langley, Virginia, prior to his departure for the above-referenced country, Richards was informed by the above referenced CIA superiors that he was to create a list of all materials/supplies, personnel and facilities that would be necessary to conduct this training.

12.    In that briefing, Plaintiff was also informed by these same CIA superiors that he was to "hand-off" or put on hold all other projects, because Plaintiff would be deploying to the foreign country in question immediately.

13.    In another briefing prior to his departure, Plaintiff met with the Chief of the Directorate of Operations/[**REDACTED BY CIA**] (Chief DO/SAD). In that briefing, the Chief DO/SAD informed Plaintiff that he (the Chief DO/SAD) had just received a cable from the Chief of Station (COS) of the country[4] Richards was deploying to and stated that the COS has a firing range "all set up for you, with transportation."

14.    In that same briefing, Chief DO/SAD informed Richards that, if the range is not in a safe location, or if it does not fit Richards' needs, "dump it and find a new location." The Chief DO/SAD further stated that Richards was to "do whatever he needed to do" to complete his mission.

---

[4] Again, the identity of the COS and the Station location is known to Richards but has been withheld from this document pursuant to the CIA's request.

15.    Within days of that briefing, in or about August of 2003, Richards and another CIA employee[5] ("the other instructor") who would assist in the mission departed from Dulles Airport for the foreign location.

16.    Upon landing at the location in question, Richards and the other instructor attempted to establish contact with COS but were unable to find him until the following morning.

17.    The morning after they arrived in the location in question, Richards and the other instructor met with COS, [**REDACTED BY CIA**], the head of security, and the deputy head of security.

18.    In that briefing, COS thanked Richards and the other instructor for coming, and informed them that everything had been taken care of. COS stated that a range had been located and that COS deemed it ideal for their needs.

19.    In that briefing, COS then stated that Richards and the other instructor would be taken to the location COS had already selected to set up for classes that were to start the following morning.

20.    In that briefing, COS further stated that Richards and the other instructor would not only train the twelve individuals they were sent to train, but would also train additional individuals because word had gotten out that instructors had arrived at the station in question and a number of uncertified officers of the CIA and other U.S. Government agencies were coming to the station to get certified (or re-certified).

21.    In that briefing, Richards and/or the other instructor informed COS that their orders were very clear: they were to train the twelve individuals they were sent to train, and then immediately return to Langley.

---

[5] The identity of this individual is known to Plaintiff but has been withheld from this document pursuant to the CIA's request.

22.    In that briefing, COS responded that he, and he alone, would determine who Richards and the other instructor would train, and would also solely determine when Richards and the other instructor had completed their mission and could return to Langley.

23.    After the briefing, Richards and the other instructor were driven to the training location COS had chosen.

24.    Upon their arrival at the training location, both Richards and the other instructor came to the conclusion, based on their years of experience in firearms training, that the training location was unsafe and entirely unsuitable for their mission.

25.    Richards and the other instructor then returned to COS's location and met with COS. In that meeting, Richards and the other instructor informed COS that the training location that COS had chosen was not acceptable for the following reasons:

a.    The location had no ventilation or electricity, and was an indoor location.

b.    The "backstop" had been shot apart by large caliber weapons, creating a very dangerous situation and a high probability for ricochet.

c.    The location had substantial security issues.

d.    The location had no access to water. Any water would have to be trucked in from COS's location. Water was necessary not only for hydration (the temperature at the location was approximately 125 degrees) but also for washing hands and faces to prevent lead contamination.

e.    The location had no ventilation. There was no working HVAC system. It was a room approximately 35 feet wide by 50 feet long with low ceilings, no windows, and a single point of entry/exit.

f.    The range was filthy. It was clear that <u>millions</u> of rounds of ammunition had been discharged in the room over the years, and little or no time had been spent on range maintenance.

Therefore, everything in the range, the floor, walls, even the ceiling were coated with a fine layer of dust that was secondary to the discharge of firearms. This "dust" was highly toxic.

26.     In that meeting, after all of the deficiencies and hazards had been explained to COS, **[REDACTED BY CIA]** and the security officers, COS stated that "We spent a lot of time and effort finding that range for you guys. The least you can do is meet us halfway and make it work!"

27.     In that meeting, COS[6] further stated "I want you two [Richards and the other instructor] to go back out there, grab some brooms, and make it work!"

28.     As frustrated as Richards was with COS's orders, they were clear orders from his superior officer and thus Richards and his partner gathered cleaning supplies, a vehicle, and their other gear and returned (by themselves, without any security) to the training location chosen by COS in an attempt to fulfill COS's orders and "make it work."

29.     Richards felt the first effects of what he much later confirmed was lead poisoning after the first day of cleaning the training location. Richards had a metallic taste in his mouth and nose, severe head ache, and stomach pains. The other instructor suffered similar symptoms.

30.     Richards and the other instructor realized this training location was untenable, and looked for alternate locations. They found several different alternate training locations and also made a list of a number of ways to make the training location selected by COS safer. Richards and the other instructor brought these other options to COS and COS rejected all of them.

31.     Facing the COS's direct orders, and being left with no alternatives, Richards and the other instructor began training individuals in the COS-chosen location.

---

[6] Plaintiff has learned, through public (non-classified) channels, that COS was later replaced by a "more experienced" CIA officer, was roundly criticized (both publicly and within the CIA) for his management of the station in question, and that **[REDACTED BY CIA].**

32.    During training, the other instructor became very concerned about the health consequences, and stated that he did not feel it was safe to be in the training facility and he would not go back into it.  In refusing to remain in the toxic training facility, the other instructor stated to Richards "I love my job, but I love my wife and kids more.  And we are not done having kids!"

33.    Richards accepted this and had the other instructor conduct certain training outdoors, and Richards conducted the "live fire" training inside the location.

34.    Richards would clean the location in between classes to keep the levels of lead dust down and attempt to limit the lead exposure to his students.  While these actions appeared to protect and preserve the health and safety of his students[7], they increased Richards' exposure to toxic, and even fatal, levels of lead dust.

35.    Richards trained many individuals in this unsafe location for approximately three weeks.

36.    During this training period (which involved training far more than the 12 individuals Richards was sent to train), Richards encountered a U.S. Army Special Forces squad at the training location.  The medic (who was also a Physician's assistant) attached to that squad examined Richards and said it appeared that he was suffering the symptoms of lead poisoning.  That Special Forces Medic further stated that the U.S. Army had examined that specific training location and had declared it "off limits" to U.S. Army personnel because of the toxic lead levels.

---

[7] In fact, at or around the time of his forced Medical Retirement, Richards was informed that CIA was monitoring the lead levels of all of the individuals Richards trained in the location in question and their lead levels, while not as elevated as Richards (each of those individuals was only at the location for one class, Richards was there for a number of days), were dangerously elevated following their exposure to the training facility in question.

37.     Following his discussion with and examination by the Special Forces Medic, Richards spoke again with COS in an effort to persuade COS to reconsider his previous position. After Richards informed COS of what he learned from the Medic, COS replied that he didn't care what the Army said, "We are the CIA" and "We" need to get these individuals trained.

38.     Despite his worsening symptoms, Richards completed the training at the hazardous location and then returned to the United States on or about August 16, 2003. His last day of training at the hazardous location was on or about August 14, 2003.

39.     Richards symptoms continued after his return to the United States. As a result, Richards went to the CIA's Office of Medical Services (OMS) on or about August 18, 2003.

40.     Richards met with Dr. **[REDACTED BY CIA]**, M.D. at OMS. Without taking any blood tests or performing any neurological tests, Dr. **[REDACTED BY CIA]** informed Richards that he was not suffering from lead poisoning. Dr. **[REDACTED BY CIA]** stated that he was experienced in identifying lead poisoning, and he was certain that Richards did not have lead poisoning.

41.     In that first meeting with Dr. **[REDACTED BY CIA]**, Dr. **[REDACTED BY CIA]** further stated that he felt that Richards was suffering from post-traumatic stress disorder (PTSD). This despite the fact that Richards had been in considerably more stressful and violent situations than that from which he just returned, including, but not limited to, **[REDACTED BY CIA]**.

42.     Richards expressed his doubts at this diagnosis, and informed Dr. **[REDACTED BY CIA]** of the Army medic's belief that Richards was suffering from lead poisoning. Dr. **[REDACTED BY CIA]** dismissed the medic's opinion, stating that the medic is not a doctor,

and re-iterating that he ([**REDACTED BY CIA**]) had considerable experience with lead poisoning.

43.    Only days after this first meeting with Dr. [**REDACTED BY CIA**], Richards and his immediate supervisor attended a meeting at the FBI Academy in Quantico, Virginia on or about August 20, 2003. During that meeting, the FBI distributed a training manual identifying the risks and symptoms of lead poisoning and lead exposure in firearms training environments.

44.    During this FBI training session, Richards informed his immediate supervisor that he felt that he was suffering from lead poisoning as a result of his training in the unsafe facility in the foreign country from which he had just returned.

45.    Richards immediate supervisor became quite concerned and, when told by Richards that Dr. [**REDACTED BY CIA**] had dismissed Richards' concerns and diagnosed Richards with PTSD, stated to Richards that he and Richards were immediately going to go speak with Dr. [**REDACTED BY CIA**].

46.    Richards' supervisor concluded the FBI/CIA meeting early. Richards and his supervisor drove back to CIA headquarters and went directly to see Dr. [**REDACTED BY CIA**] at OMS.

47.    In that second meeting with Dr. [**REDACTED BY CIA**], which occurred on or about August 20, 2003, [**REDACTED BY CIA**] again stated that Richards did not have lead poisoning. Richards' supervisor showed [**REDACTED BY CIA**] the FBI training materials outlining the symptoms of acute lead poisoning and asked him to explain why Richards had virtually all of the symptoms indicated immediately after training in a range that the Army had identified as hazardous for lead toxicity.

48.    [REDACTED BY CIA] reiterated his opinion that the Army was incorrect in their analysis, and further stated that the FBI are "policemen, not doctors" and thus dismissed the FBI training materials.

49.    Richards' supervisor was unwilling to accept this dismissive explanation and insisted to [REDACTED BY CIA] that [REDACTED BY CIA] "take care of my boy [Richards]."

50.    [REDACTED BY CIA] agreed to schedule an appointment with Dr. Margit Bleecker, a neurologist that Dr. [REDACTED BY CIA] stated is a foremost expert on the subject of lead poisoning, for Richards. [REDACTED BY CIA] stated that he would take care of the required paperwork, and that, in the meantime, Richards should go to his primary care physician and get a blood lead test.

51.    On or about August 21, 2003, Richards took a blood lead test. This was the first test he took since leaving the hazardous training facility approximately one week earlier.

52.    On or about August 25, 2003, Richards received the results of the blood lead test. The test revealed a blood lead level of 52 $\mu$g/dL. Richards' physician informed him that the lead levels in his blood were dangerously high, and that, if not properly treated with chelation therapy, the lead poisoning could lead to permanent neurological damage, kidney failure, liver failure, and death.

53.    Richards' physician was very concerned and asked where he had been exposed to these high levels of lead. Because of operational security reasons, Richards was unable to tell him and, because of the confidential nature of his mission, he felt that he had to rely on OMS and Dr. [REDACTED BY CIA] to coordinate his care.

54.    On or about August 26, 2003, Richards informed Dr. **[REDACTED BY CIA]** of the test results.

55.    In that meeting (on or about August 26, 2003), Dr. **[REDACTED BY CIA]** stated that a blood lead level of 52 $\mu$g/dL was "in the middle" of the range and was "not as bad as it could be."

56.    Richards responded that his physician had serious concerns and informed him that 52 $\mu$g/dL was dangerously high and should be treated as soon as possible with chelation therapy.

57.    After being told of Richards' physician's concerns, Dr. **[REDACTED BY CIA]** changed his opinion, and stated that that a level of 52 $\mu$g/dL was "pretty high," but strongly advised against chelation therapy, stating that it "wasn't that serious" and that chelation therapy was for far more serious cases.

58.    Dr. **[REDACTED BY CIA]** reiterated that he would get Richards an appointment with Dr. Bleecker as soon as possible.

59.    After that meeting, Richards regularly e-mailed and/or called Dr. **[REDACTED BY CIA]** asking what the status of the referral to Dr. Bleecker was.

60.    During that time, Dr. **[REDACTED BY CIA]** had told Richards that he was working on the necessary paperwork to allow for the referral.

61.    Despite the fact that Dr. **[REDACTED BY CIA]** now knew the severity of Richards' lead poisoning, and that his initial mis-diagnosis of PTSD was incorrect, **[REDACTED BY CIA]** did not schedule an appointment for Richards with Dr. Bleecker until October 31, 2003 – more than 90 days after Richards exposure to toxic lead levels occurred.

62.    As a result of the delay caused by Dr. **[REDACTED BY CIA]**'s mis-diagnosis and subsequent delay in scheduling Richards' appointment with Dr. Bleecker that lead to

approximately a 90 day delay before Richards was seen by Dr. Bleecker, the therapeutic window within which lead poisoning can be treated effectively closed on Richards.

63.     CIA finally sent Richards to Dr. Margit Bleecker, a neurologist in Baltimore, MD, on or about October 31, 2003.

64.     During her examination and care of Richards, Dr. Bleecker quickly diagnosed Richards with "acute lead poisoning."

65.     Dr. Bleecker concluded that Richards' actute lead poisoning was directly and proximately caused by his training in the "old firing range that was heavily contaminated with lead dust" that Richards was ordered to train in by the COS despite Richards' continued protestations.

66.     Dr. Bleecker estimated that, at the time of the acute exposure in the "old firing range", Richards blood lead level was "in the 60's or 70's [$\mu$g/dL]."

67.     Because of the delay caused by Dr. **[REDACTED BY CIA]**'s mis-diagnosis, his failure to take seriously Richards' complaints of lead poisoning, and his delay in scheduling an appointment with Dr. Bleecker, the opportunity to perform chelation therapy had passed.

68.     On or about September 3 and 4, 2003, Richards communicated with the U.S. Army medic/physician's assistant who first diagnosed Richards with lead poisoning at the contaminated training location.

69.     In those communications, Richards asked the Army medic if the Army had prepared a written report outlining the condition of the contaminated training facility.

70.     The Army medic responded that the Army was conducting a site survey of the facility and would be taking samples to determinate the level and extent of lead contamination.

71.    Richards is informed and believes that, as a result of that site survey, the contaminated training location was bulldozed, sealed, and declared "off limits" indefinitely.

72.    As a result of the lead poisoning Richards suffered at the location forced upon him by the CIA, and the subsequent misdiagnosis (and other errors) by the CIA physician, Dr. **[REDACTED BY CIA]**, Richards has suffered, and continues to suffer, the following medical problems[8]:

- Severe headaches/migraines

- Difficulty speaking

- Myalgias (Muscle Pains)

- Arthralgias (Joint Pains)

- Slowed movements

- Stomach pain

- Irritability

- Depression

- Loss of interest in doing things

- Decreased energy

- Increased sleep

- Fatigue

- Difficulty concentrating

- Tingling in his extremities

- Erectile dysfunction

- Dizzy spells.

---

[8] This list of medical problems is illustrative and not exclusive. Mr. Richards is not limited to the medical problems listed here.

73.     Dr. Bleecker concludes that "All of Mr. Richards [medical and psychological] problems are related to a toxic encephalopathy from lead poisoning."

74.     The medical problems suffered by Richards were directly and proximately caused by the acts and omissions of the Central Intelligence Agency.

75.     The medical problems suffered by Richards were entirely avoidable had the CIA taken Richards concerns seriously and allowed him to find an alternate training location – many of which existed at the time.

76.     After receiving Dr. Bleecker's medical diagnosis, Richards was placed on medical leave from the CIA.

77.     During the period he was on medical leave, April Richards, Frank Richards' wife, overheard a telephone conversation between CIA Does #1 and #2 in which CIA Doe #1 stated to CIA Doe #2 that Richards was seeing a psychiatrist.

78.     Neither CIA Doe #1 nor CIA Doe #2 had a legitimate reason to discuss Richards' medical condition.

79.     During the period Richards was on medical leave, Richards was contacted by CIA Doe #3 (a female) who informed Richards that she had been told by a number of other female CIA employees (CIA Does #4-9) that Richards was on medical leave because his "shit don't work anymore" and "his dick is broke."

80.     Richards is informed and believes that CIA Does #1-20 spoke (and continue to speak) openly and freely (and often inaccurately and pejoratively) about his injuries for no legitimate reason.

81.     Richards has been harmed, personally and professionally, as a direct and proximate result of the CIA's failure to preserve his privacy.

82.     Richards was medically retired by the CIA on or about May 4, 2006.

83.     Prior to being medically retired, Richards and his wife had a series of meetings with K.D. "Dusty" Foggo, who was at the time the Executive Director of the CIA.

84.     In those meetings, Foggo stated that Richards injuries were a result of the CIA's mistakes, and that Richards' injuries were "completely avoidable" and "never should have happened."

85.     On May 4, 2006, Foggo wrote a "right of return" letter to Richards, stating that "We appreciate your dedication and service, and we understand that the tragic circumstances of your illness are a direct result of that dedication."

86.     In that "right of return" letter, Foggo also stated that Richards "will retire from CIA as a GS-13 officer."

87.     In fact, CIA did not retire Richards as a GS-13, and he has been financially harmed as a result. Despite the CIA's promises (by and through Foggo) that he would be retired as a GS-13, Richards has been treated as a GS-12, Step 6, since his forced medical retirement.

88.     Richards injuries persist to date, and will persist for the foreseeable future. The neurological damage is such that Richards will never be employable in his chosen profession, or for that matter, will he ever be capable of maintaining a job that involves anything but the most menial tasks.

## FIRST CAUSE OF ACTION
## (FIFTH AMENDMENT LIBERTY INTEREST – CIA)

89.     Richards reasserts and realleges the allegations contained in paragraphs 1 through 88, inclusive.

90.     Richards is a Citizen of the United States, and possesses all of the Constitutional, statutory, and regulatory rights afforded to any employee of the Central Intelligence Agency. These include, but are not limited to, the usual rights, privileges and benefits that are accorded to federal employees.

91.     The Fifth Amendment to the Constitution of the United States states, in relevant part that "No person shall be . . . deprived of life, liberty, or property, without due process of law."

92.     The CIA did deprive Richards of his "life, liberty, or property, without due process of law" by forcing Richards to train in a highly toxic environment, for no legitimate reason, and to continue to train in this highly toxic environment even after being informed of the inherent health hazards associated with that location by Richards and others.

93.     The CIA's actions constituted an unconstitutional deprivation of Richards' "life liberty, or property, without due process of law" in that the CIA knew, or reasonably should have known, that its actions would cause Richards serious bodily harm, such harm was avoidable, and such harm was caused without due process of law.

94.     Richards attempted to protest COS's orders, but was not afforded the ability to do so effectively.

95.     The CIA is not authorized to operate in a manner whereby an individual can be denied "Liberty" without "due process of law" in contravention of the Fifth Amendment to the Constitution of the United States.

96.     The CIA's actions and inactions, and those of one or more of the defendants, have excluded Richards from participating in his chosen profession. Richards injuries persist to date, and will persist for the foreseeable future. The neurological damage Richards has suffered as a

result of CIA's actions is such that Richards will never be employable in his chosen profession, or for that matter, will he ever be capable of maintaining a job that involves anything but the most menial tasks.

97.    As a result, Richards has suffered actual adverse and harmful effects, including, but not limited to, the following:

- Severe headaches/migraines

- Difficulty speaking

- Myalgias (Muscle Pains)

- Arthralgias (Joint Pains)

- Slowed movements

- Stomach pain

- Irritability

- Depression

- Loss of interest in doing things

- Decreased energy

- Increased sleep

- Fatigue

- Difficulty concentrating

- Tingling in his extremities

- Erectile dysfunction

- Dizzy spells.

- Emotional trauma

- Mental distress

- Embarrassment

- Humiliation

- Marital difficulties

- Lost or jeopardized present and/or future financial opportunities.

## SECOND CAUSE OF ACTION
## (PRIVACY ACT – CIA)

98.    Richards reasserts and realleges the allegations contained in paragraphs 1 through 97, inclusive.

99.    The CIA maintains records within one or more Privacy Act Systems of Records that pertain to Richards.

100.    During the period he was on medical leave, April Richards, Frank Richards' wife, overheard a telephone conversation between CIA Does #1 and #2 in which CIA Doe #1 stated to CIA Doe #2 that Richards was seeing a psychiatrist.

101.    Neither CIA Doe #1 nor CIA Doe #2 had a legitimate reason to discuss Richards' medical condition.

102.    During the period Richards was on medical leave, Richards was contacted by CIA Doe #3 (a female) who informed Richards that she had been told by a number of other female CIA employees (CIA Does #4-9) that Richards was on medical leave because his "shit don't work anymore" and "his dick is broke."

103.    Richards is informed and believes that CIA Does #1-20 spoke (and continue to speak) openly and freely (and often inaccurately and pejoratively) about his injuries for no legitimate reason.

104.    Richards has been harmed, personally and professionally, as a direct and proximate result of the CIA's failure to preserve his privacy.

105.    Richards is informed and believes that these statements – revealing and/or misrepresenting his confidential medical information – were repeated by the CIA and/or the CIA Doe defendants numerous times and continue to be repeated to date.

106.    In disclosing Richards' sensitive medical information to individuals with no need to know this information, the CIA, its employees and officers, including, but not limited to, one or more of the individual defendants violated the provisions of 5 U.S.C. §552a (b) and (g)(1)(D).

107.    The CIA, its employees and officers, including, but not limited to, one or more of the individual defendants, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

108.    The CIA, its employees and officers, including, but not limited to, one or more of the individual defendants, acted intentionally or willfully in violation of Richards' privacy rights.

109.    As a result of one or more of the defendants' violations of the Privacy Act, Richards has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, a worsening of his depression, and lost or jeopardized present or future financial opportunities.

## THIRD CAUSE OF ACTION
### (PRIVACY ACT – DOES #1 - #10)

110.    Richards reasserts and realleges the allegations contained in paragraphs 1 through 109, inclusive.

111.    The CIA maintains records within one or more Privacy Act Systems of Records that pertain to Richards.

112.   During the period he was on medical leave, April Richards, Frank Richards' wife, overheard a telephone conversation between CIA Does #1 and #2 in which CIA Doe #1 stated to CIA Doe #2 that Richards was seeing a psychiatrist.

113.   Neither CIA Doe #1 nor CIA Doe #2 had a legitimate reason to discuss Richards' medical condition.

114.   During the period Richards was on medical leave, Richards was contacted by CIA Doe #3 (a female) who informed Richards that she had been told by a number of other female CIA employees (CIA Does #4-9) that Richards was on medical leave because his "shit don't work anymore" and "his dick is broke."

115.   Richards is informed and believes that CIA Does #1-20 spoke (and continue to speak) openly and freely (and often inaccurately and pejoratively) about his injuries for no legitimate reason.

116.   Richards has been harmed, personally and professionally, as a direct and proximate result of the CIA's failure to preserve his privacy.

117.   Richards is informed and believes that these statements – revealing and/or misrepresenting his confidential medical information – were repeated by the CIA and/or the CIA Doe defendants numerous times and continue to be repeated to date.

118.   In disclosing Richards' sensitive medical information to individuals with no need to know this information, the CIA, its employees and officers, including, but not limited to, one or more of the individual defendants violated the provisions of 5 U.S.C. §552a (b) and (g)(1)(D).

119.   The CIA, its employees and officers, including, but not limited to, one or more of the individual defendants, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

120.    The CIA, its employees and officers, including, but not limited to, one or more of the individual defendants, acted intentionally or willfully in violation of Richards' privacy rights.

121.    As a result of one or more of the defendants' violations of the Privacy Act, Richards has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, a worsening of his depression, and lost or jeopardized present or future financial opportunities.

### FOURTH CAUSE OF ACTION
### (FTCA – CIA)

122.    Richards reasserts and realleges the allegations contained in paragraphs 1 through 121, inclusive.

123.    In directing Richards to conduct training in a known hazardous and toxic location, the CIA did willfully and/or negligently cause severe neurological harm to Richards.

124.    The CIA knew, or reasonably should have known, that Richards would be severely harmed by the high levels of lead found at the firing range in question.

125.    There was no legitimate reason for Richards to be placed in this hazardous environment – there were other ranges available that were equally well suited for the training Richards was conducting.

126.    The decision to choose this particular training location was not a "uniquely governmental" decision – it was an (erroneous) administrative decision made with no regard to the health and safety of Richards, his training partner, or those U.S. Citizens who were trained in that location.

127.    The CIA's actions and inactions, and that of one or more of the defendants, have excluded Richards from participating in his chosen profession. Richards injuries persist to date,

and will persist for the foreseeable future. The neurological damage Richards has suffered as a result of CIA's actions is such that Richards will never be employable in his chosen profession, or for that matter, will he ever be capable of maintaining a job that involves anything but the most menial tasks.

128.    As a result of the CIA's tortious actions, Richards has suffered actual adverse and harmful effects, including, but not limited to, the following:

- Severe headaches/migraines
- Difficulty speaking
- Myalgias (Muscle Pains)
- Arthralgias (Joint Pains)
- Slowed movements
- Stomach pain
- Irritability
- Depression
- Loss of interest in doing things
- Decreased energy
- Increased sleep
- Fatigue
- Difficulty concentrating
- Tingling in his extremities
- Erectile dysfunction
- Dizzy spells.
- Emotional trauma

- Mental distress

- Embarrassment

- Humiliation

- Marital difficulties

- Lost or jeopardized present and/or future financial opportunities.

129.    Richards wrote to CIA on December 19, 2007 outlining his claims.   CIA responded to Richards' December 19, 2007 letter on January 22, 2008.  In that January 22, 2008 letter, CIA stated that "The Agency interprets this claim as one for damages pursuant to the Federal Tort Claims Act (FTCA).  The Agency has given this claim appropriate consideration and has denied it."

## FIFTH CAUSE OF ACTION
## (FTCA – CIA)

130.    Richards reasserts and realleges the allegations contained in paragraphs 1 through 129, inclusive.

131.    At all relevant times, Dr. **[REDACTED BY CIA]** was acting in the scope of his employment as a physician for OMS, which is a department in the CIA.

132.    In relying upon the medical opinions and diagnoses of Dr. **[REDACTED BY CIA]**, who, Richards is informed and believes has no neurological training, CIA extinguished any chance Richards had at recovering from his acute lead poisoning.

133.    Dr. **[REDACTED BY CIA]**'s mis-diagnoses, delayed diagnoses, and unreasonable delay of more than 90 days in referring of Richards' case to Dr. Bleecker, who was properly trained to identify, diagnose, and treat acute lead poisoning, prevented Richards from

being able to receive Chelation therapy treatment, which would have substantially increased his chance of recovery and would have substantially improved his quality of life.

134.    A reasonably prudent general medical practitioner, when faced with the information provided to Dr. **[REDACTED BY CIA]** regarding Richards' lead exposure would have immediately referred the matter to a specialist trained to further identify, diagnose and treat lead poisoning.  Instead, Dr. **[REDACTED BY CIA]** waited more than 90 days before he referred Richards to Dr. Bleecker.

135.    As a direct and proximate result of the delay caused by Dr. **[REDACTED BY CIA]**'s mis-diagnosis and subsequent delay in scheduling Richards' appointment with Dr. Bleecker that lead to approximately a 90 day delay before Richards was seen by Dr. Bleecker, the therapeutic window within which lead poisoning can be treated effectively closed on Richards.

136.    As a result of the CIA's negligent actions, by and through its agent, Dr. **[REDACTED BY CIA]**, Richards has suffered actual adverse and harmful effects, including, but not limited to, the following:

- Severe headaches/migraines
- Difficulty speaking
- Myalgias (Muscle Pains)
- Arthralgias (Joint Pains)
- Slowed movements
- Stomach pain
- Irritability
- Depression

25

- Loss of interest in doing things

- Decreased energy

- Increased sleep

- Fatigue

- Difficulty concentrating

- Tingling in his extremities

- Erectile dysfunction

- Dizzy spells.

- Emotional trauma

- Mental distress

- Embarrassment

- Humiliation

- Marital difficulties

- Lost or jeopardized present and/or future financial opportunities.

137. Richards wrote to CIA on December 19, 2007 outlining his claims. CIA responded to Richards' December 19, 2007 letter on January 22, 2008. In that January 22, 2008 letter, CIA stated that "The Agency interprets this claim as one for damages pursuant to the Federal Tort Claims Act (FTCA). The Agency has given this claim appropriate consideration and has denied it."

WHEREFORE, Franklin Richards requests that the Court award him the following relief:

(1) Declare and find that the Defendants violated the Privacy Act by failing to make reasonable efforts to assure that such records and information regarding Richards were properly

26

secured and were not disseminated to unauthorized individuals, and award any damages, or other appropriate relief, including costs and attorney's fees, that are deserved there from;

(2)    Declare and find that Defendants violated Richards' constitutional protections by failing to safeguard his fundamental Liberty Interests as defined in the Fifth Amendment to the United States Constitution and award any damages, or other appropriate relief, including costs and attorney's fees, that are deserved there from;

(3)    Require the CIA to reimburse Richards for all associated expenses to resolve these disputes;

(4)    Refer those CIA officials and employees responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

(5)    Award Richards the costs of this action and reasonable attorney's fees under the Equal Access to Justice Act or any other applicable law;

(6)    Award Richards $3,000,000 for pain, suffering, lost future wages and economic opportunities; and

(6)    grant such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by Jury.

Respectfully submitted,

July 21, 2008

Daniel S. Ward, D.C. Bar #474339
Ward & Ward, P.L.L.C.
2020 N Street, N.W.
Washington, D.C. 20036
(202) 331-8160
(202) 331-9069 Fax
dan@wardlawdc.com

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Franklin A. Richards | Central Intelligence Agency, General Michael V. Hayden & CIA Does #1-20 |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Daniels S. Ward, Ward & Ward PLLC 2020 N Street, NW, Washington, DC 20036 202-331-8160, 202-331-9069 Fax Dan@wardlawdc.com | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ● B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☒ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Cou** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Ju

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
FTCA, 28 USC §§2674 & 2680(h), Privacy Act, 5 USC § 552a et seq., 5th Amendment to the U.S. Constitution

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $ 3,000,000.00 Check YES only if demanded in co JURY DEMAND: YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE July 21, 2007  SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tij for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Sect II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents th primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.